1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
NJ HOTEL MANAGEMENT, LLC,      :
             Plaintiff,        :
                              :
 -vs-                         :         Case No. 1:11-cv-1213
                              :
                              :
MOLINARO KOGER, INC., et al.  :
             Defendants.       :
                              :
------------------------------:
```

HEARING ON MOTIONS

November 28, 2011

Before:  Liam O'Grady, USDC Judge

APPEARANCES:

Kevin W. Mottley, Counsel for the Plaintiff

Daniel S. Ward, Counsel for the Defendants

INDEX

OPENING STATEMENTS BY

  MR. MOTTLEY                                              9


WITNESS                          EXAMINATION      PAGE

  KETAN MEHTA

                                 DIRECT            15
                                 CROSS             34
                                 REDIRECT          46
                                 RECROSS           46


CLOSING ARGUMENTS BY

  MR. WARD                                               48

1            THE CLERK:  Civil action 1:11-cv-1213, New Jersey

2    Hotel Management, LLC versus Molinaro Koger, Incorporated, et

3    al.

4            Will counsel please identify themselves for the

5    record.

6            MR. MOTTLEY:  Your Honor, my name is Kevin Mottley, I

7    represent the plaintiff, NJ Hotel Management, LLC.

8            THE COURT:  All right, good afternoon.

9            Good afternoon, sir.

10           MR. WARD:  Good morning, Your Honor.  Daniel Ward on

11   behalf of, my indulgence, Your Honor, all the defendants other

12   than Rob Koger.

13           THE COURT:  All right.  Good afternoon, Mr. Ward.

14           Where are we?  I understand that we at least have

15   partially resolved the case, if I heard correctly.

16           Mr. Mottley.

17           MR. MOTTLEY:  Your Honor, from my client, the

18   plaintiff's perspective, there has been zero resolution.  There

19   is no agreement whatsoever.

20           Now, what you're going to hear is a lot from Mr. Ward

21   today about, I assume, negotiations that have been going on

22   amongst the defendants.  And now, my client has been very

23   patient in allowing those discussions to play themselves out

24   because we have been told that allowing that to happen would be

25   good for our client.  It has not turned out to be that way.

1        So, we stand before you today without anything more

2   than we had three weeks ago.

3            THE COURT:  All right.  Thank you.

4            Mr. Ward.

5            MR. WARD:  Your Honor, I would say that it might not

6   be good for his client, but it won't be bad for his client

7   either.  I have something that I can hand up to you, if you

8   wish.

9            THE COURT:  Sure.

10           MR. WARD:  I am going to give you the signed copy.  I

11  need this back, but I want to show it to you.

12           I have spent my Thanksgiving holiday, as it were, in

13  a less than celebratory way trying to get this done.

14           THE COURT:  I am sorry for that.

15           MR. WARD:  That's okay.  I have, as I have told the

16  Court, and as is the case, there are a number of defendants

17  here, those that I represent and those that are responsible for

18  the harm to plaintiffs.

19           I have been negotiating with that party to try to get

20  him a stay of execution, if you will.  And to do that, he needs

21  to pay my clients what we're due and create certain security

22  from which we will pay plaintiffs.

23           We have an agreement that you have in front of you

24  that we have, that we have gotten a signature to and that my

25  clients have signed.  That gives him until 5 p.m. today to

5

1   release a $2 million escrow that he may or may not have.  He

2   tells us he has it.

3          In return, we have agreed not to testify against him

4   today.  That was my client's decision.  I am not terribly

5   overjoyed about it, it is what it is, but it is, as I have

6   said, a stay of execution.

7          If the money doesn't come in--  Two things are going

8   to happen here, Your Honor.  Either, one, the money comes in

9   today and they are going to get paid--

10         THE COURT:  How much are you they going to get paid?

11         MR. WARD:  $333,000.

12         THE COURT:  Is that the total claim?

13         MR. WARD:  That's in excess.  300 is the note.  33 is

14   for their attorney's fees and time and effort.

15         THE COURT:  All right.

16         MR. WARD:  That is the negotiated amount.  And Mr.

17   Mottley can be heard on that if he wishes.  So, that is above

18   and beyond, they will be whole plus.  That is number one.

19         Number two, if that money doesn't come in, I am going

20   to come back here and you are going to see me at my most

21   unkind, and it would be with the ire directed towards Mr. Koger

22   to explain, A, why we shouldn't have an injunction against us;

23   and, B, why you shouldn't send Marshals out to pull his

24   fingernails out if you want.

25         So, I'm looking for one day.  I know I'm coming to

1    you a second time in a courthouse that frowns on extensions

2    asking for time.  I'm asking for time that plaintiffs do not

3    consent to, but they will not be harmed by 24 hours, Your

4    Honor.

5           If you want to take a moment to look at that, please

6    do.  If you have any questions for me, I would be happy to hear

7    them.

8           But the alternative is I have to just roll over and

9    show plaintiff my belly and let them scratch it and be stuck

10   with a preliminary injunction against people who have clean

11   hands today.

12          So, 24 hours, Your Honor.  Less than.  It doesn't

13   need to be 2 o'clock tomorrow.  It can be 10 a.m. tomorrow.

14          THE COURT:  Mr. Mottley, what harm do you suffer in

15   waiting for me to enter my order?

16          The temporary restraining order was continued to

17   today's date by agreement, extending the temporary relief that

18   I ordered, and whether I got it out at be 5 o'clock or

19   10 o'clock tomorrow morning, what difference does that make as

20   long as the temporary restraining order remains in place?

21          MR. MOTTLEY:  I will grant you that that small

22   difference in time, I am not going to hand stand here and argue

23   that there is prejudice to my client, but I will point this

24   out, Your Honor.  We have been here before and had this

25   discussion before.  On November 18, now Mr. Ward had just been

1   retained and was getting up to speed, and he has done a lot of

2   work to do that, but at that time we were asking for a short

3   extension of the TRO.  My clients didn't agree to that at that

4   time and/or were upset and frustrated that we didn't have a

5   more permanent order entered at that time.

6        On November 18 we did orally talk about this number

7   $333,000.  That, of course, was on November 18.  I have tried

8   not to do much work since then, trying to hold my client's

9   legal fees down, but just coming up here today has resulted in

10   more attorney's fees.

11        Your Honor, that was November 18.  Here we are at

12   November 28, and the 333 number contemplated a payment being

13   paid by the defendants like on November 19.

14        So, this case, Your Honor, as you will quickly

15   determine, and I am speaking categorically of all the

16   defendants, trying to get your arms around the facts is like

17   shoveling air, you never get anywhere.  All you get are

18   requests for more time, please give us another chance, we have

19   got some closing going on, we are moving money around.  And it

20   just never happens.

21        And my clients have been playing this game since

22   August.  We are ready and prepared to go forward with the

23   preliminary injunction hearing.  I don't believe that doing

24   that today would impede the ability of the defendants, whatever

25   their agreement among themselves may be, from paying us the

1    money.

2              And we are here.  We are prepared.  We have made a

3    lot of travel arrangements to be here.  Even moving the hearing

4    back to 2 o'clock actually has negatively impacted my client's

5    travel plans, but we have done it anyway, I was amenable to

6    that.

7              THE COURT:  Well, I am not suggesting that you not be

8    allowed to put on any evidence that you want to this afternoon

9    in support of the preliminary injunction.  I'm just talking

10   about the date when it would become effective.

11             MR. MOTTLEY:  Okay.  And I think on that issue, Your

12   Honor, I don't believe there would be prejudice to my client.

13   And we're talking about a matter of hours in entering the

14   order.

15             THE COURT:  Right.  Thank you.

16             Mr. Ward.

17             MR. WARD:  If I may, Your Honor, the only thing I

18   would say is if we were to proceed that way, so be it, let him,

19   let Mr. Mottley and plaintiffs put in their evidence.

20             I would like to have the opportunity to put on my

21   evidence, which is exculpatory to my client, that I can't do

22   per that contract until tomorrow.  I don't know how we deal

23   with that, Your Honor.  And here is why I don't--

24             THE COURT:  No, here is how we are going to deal with

25   it.  The motion was set for the 18th of November.  I extended

1  it ten days at your request.  You have made a good faith effort

2  to resolve the situation.  It hasn't been resolved.

3          The hearing date was set and the time to respond is

4  at the hearing.  And I am going to hear evidence that Mr.

5  Mottley wants to provide.  You think that you have evidence to

6  the contrary.  You can file a motion asking that the case be

7  reopened at a subsequent time and proffer why and I will

8  consider it.

9          But we are here today to have the hearing, and if

10 your client at his own risk isn't prepared to do so, he is not

11 prepared to do so.  And we are not going to keep the plaintiffs

12 from presenting their case.  And if I find that there is some

13 good cause, I may allow the case to be reopened for you to make

14 argument at a later time.

15         So, that's the way we are going to proceed.

16         MR. WARD:  Thank you, Your Honor.

17         THE COURT:  All right.  Mr. Mottley.

18         MR. MOTTLEY:  Yes, sir.  Your Honor, if Your Honor

19 would, three weeks ago I handed you a book of exhibits, and I

20 don't know if you still have them, but I have another copy.

21         THE COURT:  I am sure I have them, but I don't have

22 them up here at the bench.  So--

23         MR. MOTTLEY:  All right.  There you are.

24         THE COURT:  All right, go ahead.

25         MR. MOTTLEY:  Your Honor, what I would like to do is

1   just kind of start out by giving you a brief opening statement

2   of what the evidence will show at this hearing.  And I think

3   that would perhaps make a complex situation a lot more

4   efficient.

5        And I will use the exhibit book as kind of the

6   outline of this story.  I know it looks pretty thick, but it

7   can actually be, the important items may be perused very

8   quickly.

9        The first exhibit, Your Honor, is the first contact

10  that my client had about this hotel transaction in Texas.  It

11  is an e-mail dated August 14 from a gentleman named Jai Lalwani

12  to Kenny Desai.  Kenny Desai is a business acquaintance of Mr.

13  Lalwani.  He also happens to be the brother-in-law of Mr.

14  Kenneth Mehta here, or Ken Mehta, who is the principal of my

15  client.

16       So, the first contact that my client had concerning

17  this transaction came from Mr. Ward's client, Jai Lalwani.  As

18  you can see in this Exhibit 1, the e-mail that preceded that

19  e-mail came from Rob Koger.

20       And what was attached to this was Exhibit 2, Your

21  Honor, which was a purported offering of a hotel sale in

22  Irving, Texas, just outside of Dallas, for a Wyndham.

23       Exhibit 3, Your Honor, is another e-mail from Messrs.

24  Koger and Lalwani again to Mr. Desai, this time with Exhibit 4

25  attached to it, a purchase and sale agreement, or I should say

1    a purported sale purchase sale agreement for the hotel

2    described in Exhibit No. 2.

3            Now, I will pause right there for a moment.  So, what

4    is going on there in these exhibits?  What we will prove to

5    you, Your Honor, is that my client is in the business of

6    managing hotel properties.

7            Mr. Koger, we will show, is a broker, licensed by the

8    Virginia Department of Occupational and Professional

9    Regulation, as is his company, Molinaro Koger.  And that in

10   that time frame they were looking for or dealing with this

11   hotel property in Texas and a purported sale of it.

12           Now, Your Honor, as we have described in our

13   complaint, at this point in time in mid-August there had

14   already been six, seven, perhaps eight lawsuits involving Mr.

15   Koger and Molinaro Koger.  And in those suits the plaintiffs

16   alleged the identical conduct.  The plaintiffs alleged that

17   Molinaro Koger took escrow deposits for alleged hotel

18   transactions and then the money vanished.  And these suits are

19   carbon copies of one another.  I believe Your Honor may have

20   had a couple of these suits.

21           THE COURT:  I am familiar with the facts of those

22   cases, and I have gone over these exhibits on a prior occasion

23   and looked at them.  So, I don't need you to go through every

24   one and then put your client and go through every one of them

25   again to authentic them.

1        MR. MOTTLEY:  Okay, thank you.  I think the broad

2    theme here, Judge, that I do want to emphasize is that the

3    evidence is going to show, and these exhibits make clear, that

4    in the summer of 2011 something changed at Molinaro Koger.  Mr.

5    Koger had a lot of suits flying at him, a lot of TROs freezing

6    assets.  And it is going to be undisputed that Jai Lalwani and

7    Vani Lalwani and their Black Diamond companies got involved in

8    the picture.  And it's going to be undisputed that they formed

9    a couple of companies called Black Diamond Brokerage and Black

10   Diamond Hospitality, and that those companies took control of

11   Molinaro Koger.

12        It will also be undisputed that they allowed Mr.

13   Koger to remain an employee of those entities and Molinaro

14   Koger, and that they still did business together, Lalwani and

15   Koger.  And that both Lalwani and Koger were involved in

16   soliciting an escrow deposit from my client.  And we will prove

17   that as a result of the solicitations, they made that deposit.

18        Messrs. Koger and Lalwani were both involved in

19   promising to pay the money back.  That's even gone on after my

20   being retained in this matter.

21        So, Your Honor, this is a piercing the corporate veil

22   case.  We do have an entity, Molinaro Koger, Inc., that signed

23   the escrow agreement and agreed to pay this money back.  That

24   money has obviously vanished.  From everything I have heard,

25   Molinaro Koger doesn't have it.

1          Fourth Circuit case law cited in our complaint is

2     clear that in cases of fraud and misrepresentation, illegal

3     conduct, which this is, courts should have little difficulty in

4     looking through corporate veils to hold those accountable who

5     are controlling those entities that are acting badly.  And,

6     Your Honor, that's what we request in our complaint.

7          At this point, of course, we just ask for a

8     preliminary order freezing all of the defendants' assets.  They

9     all have soiled hands here.  I know Mr. Ward has worked hard

10    over the last week to get up to speed on these facts, I know he

11    is going to argue that his clients' hands are clean, but, Your

12    Honor, his client was holding Mr. Koger's hand when together

13    they approached my client about this deal.  They were holding

14    each other's hands when they encouraged my client to make an

15    escrow deposit.

16         We have one e-mail in here that I would like to

17    highlight for the Court.  And it is very early in the package,

18    Your Honor.  Yeah, here we are, Exhibit No. 3, which is the

19    e-mail I showed you earlier.  This illustrates Mr. Lalwani's

20    personal involvement in this.

21         You will see in the middle of that page on Exhibit 3

22    an e-mail from Mr. Lalwani to Mr. Desai that eventually gets

23    passed on to my client, and he is attaching the contract for

24    this alleged transaction.  And then he says:  Kenny, please

25    advise your guys, that's my client, your guys that the contract

1    can't change.  So, once they review it, please be ready to wire

2    the funds as expressed.  There is another buy.  That is broken

3    English for buyer.

4           And that's the sort of story that my client was being

5    told, we have got other buyers out there, get the escrow money

6    to us.

7           So, for Mr. Lalwani to contend now that he should

8    avoid preliminary injunctive relief because he is going to

9    prove ultimately that his hands are clean, really flies in the

10   face of the evidence that we are prepared to show you today,

11   Your Honor.

12          So, we do ask for the Court to enter a preliminary

13   injunction order.  We will not today, Judge, seek a special

14   receiver.  We are going to remove that from today's request for

15   relief.  I would, however, like the ability to, depending upon

16   how things unfold in this case, revisit that issue if it's in

17   my client's best interests to do so.  At this point I don't

18   perceive that it is.

19          THE COURT:  All right, call your first witness.

20          MR. MOTTLEY:  I would call Mr. Kenneth Mehta, please,

21   or Ken Mehta.

22          THE COURT:  Please come forward and be sworn.

23          NOTE:  The witness is sworn.

24          THE COURT:  Mr. Ward, before this gets lost in all of

25   my paperwork, let me return the contract to you, the original,

K. Mehta - Direct

15

1    at this time.  Of course, you may use it if you seek to in

2    cross-examination.

3              MR. WARD:  Thank you, Your Honor.

4              THE COURT:  All right.

5              KETAN MEHTA, called by counsel for the plaintiff,

6    first being duly sworn, testifies and states:

7         DIRECT EXAMINATION

8    BY MR. MOTTLEY:

9    Q.   Good afternoon, sir.

10   A.   Good afternoon.

11   Q.   I would ask that you direct your answers to the judge as

12   we talk today.

13             Would you please introduce yourself to the judge.

14   A.   My name is Ketan Mehta, and I am with NJ Hotel Management,

15   LLC.  I am in the business of hotel owning and operating the

16   hotels.

17   Q.   Mr. Mehta, could you spell your last name, please, for the

18   court reporter.

19   A.   Mehta, M-e-h-t-a.

20   Q.   Now, you go by Ken, is that correct?

21   A.   That is correct, sir.

22   Q.   Okay.  And I understand that you are a member and manager

23   of NJ Hotel Management, LLC?

24   A.   Yes, sir.

25   Q.   When was that entity created?

16

1  A.   Entity is about two years old, was created specifically to

2  acquire hotel.

3  Q.   Now, would you, I am going to try to speed things up a

4  little bit.  Would you please direct your comments to the

5  judge.  And you have heard me talk about this deposit in my

6  opening statement.

7        Would you please tell the judge in your own words,

8  let's walk back to August 14, 2011, and tell the judge how it

9  is that your company became involved in this transaction we

10 have been discussing.

11 A.   Shortly, second week of August I got a call from my

12 brother-in-law, Kenny Desai, who was also somehow involved with

13 Mr. Lalwani, asking me whether I have an interest in purchasing

14 a hotel in Dallas area, Texas.  Which I said yes to.  And then

15 it follow with the e-mails of the information for the hotels.

16        Now, on I believe--

17 Q.   Do you have the exhibit book in front of you?

18 A.   Yes, sir.

19 Q.   Would you look at Exhibit 1, please.

20        And, Mr. Mehta, let ask you right now right now, have

21 you reviewed every piece of paper in this exhibit book?

22 A.   Yes, sir, I have.

23 Q.   Are all of the exhibits that I have in this exhibit book

24 authentic copies of--

25        MR. WARD:  I don't have any objection.  They can

K. Mehta - Direct

17

1    admit them.  I don't have any objection, Your Honor.

2              THE COURT:  All right, thank you.  No objection to

3    the authenticity of the documents.  Go ahead.

4              MR. MOTTLEY:  Do you have objections to the

5    admissibility of any of these documents?

6              MR. WARD:  For the purposes of this hearing?

7              MR. MOTTLEY:  Right.

8              MR. WARD:  No.

9              MR. MOTTLEY:  Okay.  Your Honor, we would move that

10   all the exhibits be admitted into evidence.

11             THE COURT:  All right.  They will be admitted without

12   objection for purposes of today's hearing.

13   BY MR. MOTTLEY: (Continuing)

14   Q.   Is Exhibit 1, Mr. Mehta, the first e-mail that you

15   received concerning the transaction?

16   A.   That is correct.

17   Q.   Attached to Exhibit 1, was there anything attached to it?

18   A.   Yeah, there was an offering memorandum for the hotel.

19   Q.   Is that Exhibit 2?

20   A.   Yes, it is.

21   Q.   Let's go to Exhibit 3.

22             Now, this is another e-mail you received from Mr.

23   Desai that came from Mr. Lalwani, is that right?

24   A.   That is correct, sir.

25   Q.   And Exhibit 4, I want you to look at that.

R. Mehta - Direct

18

1        Was this document attached to Exhibit 3?

2   A.   Yes, it was.

3   Q.   Okay, thank you.  At some point, Mr. Mehta, did you

4   received or did you have any communications with Mr. Jai

5   Lalwani directly?

6   A.   Yes, I had, I don't remember the exact time and date, but

7   I have several communications with Mr. Lalwani.  Mostly on the

8   phone, sometimes in a conference call with Mr. Kenny Desai.

9   And later on I had some communications via e-mail as well.

10  Q.   Now, did you have communications with Mr. Lalwani at this

11  preliminary stage before your company signed any contracts?

12  A.   Just once.

13  Q.   Okay.  What was that conversation about?

14  A.   Conversation was, I think I was at Mr. Kenny Desai's

15  office, and he made the call to Lalwani, assuring me that my

16  deposit will be secured.  Because early on there was a question

17  of where the deposit will be held.  And Mr. Lalwani assured me

18  that this is going to be a soft deposit, meaning that there is

19  no tie to it, I can walk away from this contract any time I

20  want to and I will get my money back immediately.

21  Q.   Okay.

22        MR. WARD:  Your Honor, I don't want to bounce up and

23  down with objections because this is obviously before you, but

24  there is a lot of hearsay going on here.

25        THE COURT:  There is a lot of hearsay.  Do you want

R. Mehta - Direct

1    to make an objection?

2           MR. WARD:  I want to object.  There is not a jury

3    here and I know you can call your own strikes and balls, but,

4    yeah, this is hearsay.

5           THE COURT:  I will not receive what Mr. Lalwani told

6    you--  Well, he is a party to the action.

7           MR. MOTTLEY:  I was going to say, Judge--

8           MR. WARD:  Also as to what Mr. Desai said, Your

9    Honor.

10          THE COURT:  They are all parties to the action,

11   right?

12          MR. WARD:  Mr. Desai is not a party to the action,

13   Your Honor.

14          THE COURT:  All right.  Then overruled as to what Mr.

15   Lalwani said.

16          And why is Mr. Desai's, any substance of what he said

17   admissible at this time.

18          MR. MOTTLEY:  I don't believe the witness, I can

19   clarify this and clean it up--

20          THE COURT:  He said he was at Desai's office and he

21   spoke with Lalwani.

22          MR. MOTTLEY:  Right.

23          THE COURT:  All right.  Your objection is overruled.

24          But don't tell us what at Mr. Desai told you.  Just

25   what Mr. Lalwani may have said in response.

20

1          Let's wait for the next question and we will

2     straighten it out.

3     BY MR. MOTTLEY: (Continuing)

4     Q.   Would you explain to the judge, I think you wanted to

5     clarify something about this conversation just now, would you

6     like to say that to him?

7     A.   I was in Mr. Kenny Desai's office and he was on the

8     speaker phone, and I did speak to Mr. Lalwani directly.  It

9     just happened to be in Mr. Desai's office.

10          THE COURT:  That's what I understood you were saying.

11    Q.   All right.  At some point did you receive a draft escrow

12    agreement from either Mr. Lalwani or Mr. Koger?

13    A.   I did receive a draft escrow agreement, as well as

14    assignment of the purchase agreement through Rob Koger and

15    through Kenny Desai.

16    Q.   Now, I have asked you if at some point you started

17    communicating directly with Mr. Lalwani, and you have explained

18    to the judge how you did that.

19          What about Mr. Koger, at some point did you start

20    discussing directly with him?

21    A.   This is the time when it was time for the escrow

22    agreement, I had several communications with Mr. Koger.  And I

23    remember incidents where there was changes, my attorney asked

24    to make an escrow agreement.  And Mr. Koger said that, make the

25    change, whatever he wants to make it, and I will sign it as is.

1   Q.   Okay.  Now, to your knowledge, did Mr. Lalwani know that

2   you were talking about this transaction with Mr. Koger?

3   A.   Most of the mail went either copied to Mr. Lalwani or came

4   through Mr. Lalwani, Koger to Lalwani, and Lalwani to Mr. Desai

5   or me.

6   Q.   What was your understanding of the relationship, if you

7   had one, between Mr. Koger and Mr. Lalwani?

8   A.   My understanding was that Mr. Lalwani was owning part or

9   some part of the Molinaro Koger.  And he was, initially I was

10  told that he was a partner of Mr. Koger.

11  Q.   And who told you that?

12  A.   That came through Mr. Desai.

13  Q.   Okay.  Have you seen documents that corroborate that

14  understanding?

15  A.   Yes, I did.  I did receive some documentation.  Now, I

16  want to clarify that Mr. Desai and I, like my counsel says, he

17  is my brother-in-law and we do business together.  So, there is

18  opportunity comes up, we always pass it on to each other.

19  Q.   Okay.

20  A.   And that's how I learned about some, he was getting

21  involved with Molinaro Koger himself, thinking about it, and he

22  provided me with some of the contracts that was happening

23  between, happened between Molinaro Koger and Black Diamond and

24  Lalwani.

25  Q.   Do you know how your brother-in-law got those documents?

R. Mehta - Direct

22

1   A.   He got it through Mr. Lalwani for himself.

2   Q.   All right.  Now, look at Exhibit 6, please.

3        Do you recognize this document, sir?

4   A.   Yes, I do, sir.

5   Q.   What is this document?

6   A.   This is for assignment of purchase and sales agreement

7   that initially, initial drop came from Mr. Koger, and later on

8   was changed by my attorney.

9   Q.   Let's look at Exhibit 7?

10       What is this document?

11  A.   Again, this is, initial drop came from Mr. Koger.  And my

12  attorney made some changes to it.  And I signed it and sent it

13  out to Mr. Koger, and he sent it back.

14  Q.   Let's look back at Exhibit No. 3, please.  And this is an

15  e-mail?

16  A.   Yes, sir.

17  Q.   Would you very quickly read the middle paragraph to

18  yourself, not aloud, because I want to ask you a question about

19  that paragraph in the middle of this e-mail.

20  A.   Okay.  This came from Mr. Jai Lalwani, and it says:

21  Contract, for Dallas, following this is the extension.  Kenny,

22  please advise your guys that the contract can't change, so once

23  they review it, please be ready to wire the fund as expressed.

24  There is another buy.

25  Q.   And did you receive this e-mail?

R. Mehta - Direct

23

1   A.   Yes, I have, sir.

2   Q.   And the last sentence there in that e-mail from Mr.

3   Lalwani, what was your understanding of what he meant by that?

4          MR. WARD:  Objection.  Your Honor, this isn't an

5   e-mail to him.  I mean, we could ask someone on the street what

6   their understanding of it is, but it doesn't matter.  It is not

7   an e-mail to him.  It is an e-mail to Kenny Desai.  Kenny Desai

8   is not on the stand here.

9          THE COURT:  Yeah, provide a foundation.

10          MR. MOTTLEY:  I think what I will do is restate,

11   rephrase my question, Your Honor, if that's okay.  I will

12   withdraw it.

13          THE COURT:  Sure.

14   BY MR. MOTTLEY: (Continuing)

15   Q.   At any point did you hear that there were other buyers for

16   this property?

17   A.   Yes, I did.  As a matter of fact, there was one specific

18   phone conversation with Lalwani stating that he had an

19   additional two buyers, that he was going to go further with

20   them if I was not willing to sign the contract quickly.

21   Q.   At that point I take it you had not given, your company

22   had not given an escrow deposit to Molinaro Koger?

23   A.   That is correct.

24   Q.   That came later?

25   A.   Yes, sir.

K. Mehta - Direct

24

1   Q.   Let's go to Exhibit 9, please.

2        Do you recognize this document?

3   A.   Yes, I do.

4   Q.   There are two documents here actually.  Would you tell the

5   judge what these are.

6   A.   These are the escrow deposit, wire transfer shipped, that

7   I got it from TD Bank.  150,000 went out of my personal account

8   and another 150,000 from my partner.

9   Q.   All right.  Now, what was supposed to happen in your mind

10  after making these wire deposits?

11  A.   I was to receive a package for due diligence where it has

12  all the revenue and expenses information for the hotel itself.

13  Q.   Okay.  So, you expected to receive a due diligence

14  package?

15  A.   I was actually promised to receive that immediately.  And

16  if I may, in the hotel industry standard, sometimes the agent

17  will provide you with this information beforehand.  But in this

18  case, Mr. Koger and Lalwani push it on not providing this

19  information until I put the deposit, escrow deposit.

20  Q.   So, the escrow deposit was a precondition to your seeing

21  the due diligence materials?

22  A.   Yes, sir.

23  Q.   Well, what happened?  Did you get the due diligence

24  materials?

25  A.   No.  Right after I wire transferred the money, I was in

K. Mehta - Direct

25

1   person to receive this information through Internet and e-mail.

2   And I asked several times to have this information sent to me.

3   Q.   All right.

4             THE COURT:  Mr. Mottley, before I forget, Exhibit 9

5   has got some personal information, and it needs to be redacted.

6             MR. MOTTLEY:  Yes, sir.  This copy has not been

7   redacted.  Everything that has been electronically filed I did

8   redact.  And I would be happy to do that today, Your Honor.  I

9   brought a Sharpie so I could take care of that.

10             THE COURT:  All right.

11             MR. MOTTLEY:  I don't want that to get in the record.

12             THE COURT:  Yes, thank you.  All right, go ahead.

13   BY MR. MOTTLEY: (Continuing)

14   Q.   I want to go back to Exhibit 8.

15             Now, do you recognize this e-mail, sir?

16   A.   Yes, I do.

17   Q.   And is this an e-mail from you to Mr. Koger on August 26?

18   A.   Yes, sir.

19             MR. WARD:  Objection.  I just want to clarify that

20   the document, it's actually to Mr. Koger and to Kenny Desai.

21   Q.   You are correct, it's to both of those gentlemen, is that

22   right?

23   A.   Yes.

24             THE COURT:  All right.

25   Q.   Now, would you please read the postscript message, p.s.

K. Mehta - Direct

26

1  A.  Please sent me due diligence package for this hotel at

2  your earliest.  If you have electronic copy, please e-mail

3  today so I will get whole weekend to work since I will not be

4  going out in this whether.

5        That was the weekend of that storm on the East Coast.

6  Q.  The hurricane that came up the East Coast?

7  A.  Yes, sir.

8  Q.  Okay.  Now let's go to Exhibit No. 10.

9        Now, do you recognize this e-mail?

10  A.  Yes, I do.

11  Q.  Okay.  Now, this e-mail appears to be from you to Rob

12  Koger, and then it copies Mr. Desai and then James at an e-mail

13  address.

14        Who is James?

15  A.  James is my partner in NJ Hotel Management.

16  Q.  Is he here today?

17  A.  Yes, he is.

18        MR. MOTTLEY:  And he is right here in the front row,

19  Your Honor.

20        THE COURT:  Good afternoon, sir.  Last name is

21  Suruchi?

22        MR. MOTTLEY:  It is Hajari.

23        THE COURT:  Hajari.  All right, good afternoon.

24  BY MR. MOTTLEY: (Continuing)

25  Q.  Now, Mr. Mottley, what are you conveying, just summarize

K. Mehta - Direct

27

1   here, to Mr. Koger in this e-mail?

2   A.   Well, when I didn't hear from Mr. Koger, I did not receive

3   any information for due diligence, so I sent him e-mail, this

4   e-mail, asking him for the same information.  Where I say:  I

5   have not heard from you for past three days.  Tomorrow will be

6   an week since we have wire transfer escrow deposit.  I have

7   been getting conflicting story from you and Kenny.  I don't

8   have to remind you that time is essence of this deal, and

9   currently we are wasting our time.  I hope you--

10   Q.   Let's go--

11   A.   I am sorry.

12   Q.   I am sorry.  Go ahead.  Let's go to Exhibit No. 11.

13   A.   Yes, sir.

14   Q.   Before we talk about this, at some point did Mr. Koger

15   send you an Internet link for the due diligence materials?

16   A.   Yes, he did.

17   Q.   Is that in Exhibit 11?

18   A.   Yes, it is.

19   Q.   Okay.  Did the link for the due diligence materials work?

20   A.   It never worked, no, sir.

21   Q.   Did you call Mr. Koger?

22   A.   Yes.  I sent him an e-mail in the reference, I actually

23   texted him.  I don't remember, my memory doesn't serve me that

24   well, but I asked him repeatedly, I was not able to open a

25   particular link that he sent me.

1  Q.   At some point did Mr. Lalwani and you have a discussion

2  about the availability of the due diligence materials?

3  A.   Yes, I did.

4  Q.   Did Mr. Lalwani give you an Internet link?

5  A.   What Mr. Lalwani did is he went one step further where he

6  sent his own--  In order for me to access this due diligence

7  package, you require password and user's ID.  Where Mr. Lalwani

8  sent me his own password and the user's ID for me to access

9  this link.  Which I was never able to do.

10 Q.   And there are e-mails in here, are there not, showing you

11 trying to get the due diligence materials?

12 A.   I did several times through e-mail and verbal

13 communications, as well as the text messages.

14 Q.   As we sit here today, have you or anyone else at your

15 organization been provided the due diligence materials for this

16 transaction?

17 A.   No, no one.

18 Q.   All right.  So, having not received the due diligence

19 materials, would you explain to the judge what you did at that

20 point.

21 A.   Well, first week of September I went forth and back.  And

22 since I was not receiving, and I only had 30 days to do due

23 diligence and shortly after to do the closing, I asked my

24 attorney to send out termination letter in the end of

25 September, first week of September.  I think it was

1    September 8.

2    Q.   I am going to direct you to several exhibits here and just

3    get you to confirm that these are letters from your attorney

4    terminating your company's involvement, and it's Exhibits 17--

5              THE COURT:  Well, how about 13?

6    Q.   I am sorry, I missed one.  13, 17 and then 20.

7              Are those all copies of letters that your attorney

8    sent to --

9    A.   Yes, I did.

10   Q.   -- Mr. Koger seeking the deposit?

11   A.   I am sorry?

12   Q.   Are those all copies of letters that your attorney sent to

13   Mr. Koger seeking the deposit?

14   A.   Yes, sir.

15   Q.   Now, why is it, because the Court may be wondering, why is

16   it that a termination and request for the escrow was sent on

17   September 8 and then another one, that is Exhibit 13, and then

18   another one was sent on September 27?

19             Would you explain why two of them were necessary.

20   A.   Well, since I was not getting anywhere through with

21   information from Mr. Koger or Lalwani, I sent out this letter.

22   Shortly after that I started receiving the calls from Mr.

23   Koger.  And I am not sure whether I received the call from Mr.

24   Lalwani or not, but I did receive the communication from Mr.

25   Koger.  And he says, if the time is the issue for you, we will

1    get you additional 30 days to do your due diligence if you just

2    give me a chance to provide you with this information that you

3    need.

4    Q.   And so, did you give him a chance to do that?

5    A.   I say, if I receive, I remember talking to him, and I

6    said, if I receive this information in the next two days, I

7    will go forward with it, otherwise we will cancel it.

8    Q.   Okay.  Now let's look at Exhibit 14.

9    A.   Yes, sir.

10   Q.   And in this--  Do you recognize this e-mail?

11   A.   Yes, I do.

12   Q.   And this comes two days after the termination notice.  And

13   is this one of the communications you had with Mr. Koger where

14   you sought due diligence after September 17?

15   A.   Yes.

16   Q.   Okay.  Did you ever get the due diligence?

17   A.   Never did.

18   Q.   All right.  Let's go to Exhibit 15.

19         Do you recognize this text message?

20   A.   Yes.

21   Q.   Would you describe to the Court what this is.

22   A.   This is I guess from my iPhone where I communicated with

23   Mr. Koger directly via text messages.

24   Q.   And what is the nature of the communication here?  Just

25   summarize very quickly?

1    A.   Well, most of the communication was, in the beginning was

2    about getting information from the hotel.  And I asked him in

3    so many different ways to give me this information.

4            Later on I used this way of communication to ask for

5    my money back.

6    Q.   Did he tell you he had sent it or was going to send it?

7    A.   Amazingly enough, he promised me on so many occasions,

8    even going as far as telling me the money is already

9    transferred, where actually it was not transferred.  And it is

10   in this text message that you will see that.

11   Q.   Yes.  Now, sir, at any point did Mr. Lalwani tell you your

12   money would be returned to you?

13   A.   Yes.  I think it was at least three different occasions

14   where he said that.

15   Q.   Before filing the lawsuit?

16   A.   Yes.

17   Q.   Okay.  How about since filing the lawsuit?

18   A.   Since filing the lawsuit, no, only once he said that the

19   money will be transferred.  And I told him, I said, you should

20   be talking to my attorney rather than me.

21   Q.   Okay.  Let's go to Exhibit 21, please.  This is a several

22   page e-mail.  I just want you to very quickly familiarize

23   yourself with that.

24           Now, I want to ask you, is the subject matter of

25   these e-mail communications the return of NJ Hotel's deposit?

K. Mehta - Direct

32

1  A.    That is correct.

2  Q.    On page 2 of 4 of this e-mail, there is an e-mail from Rob

3  Koger to Kenny Desai, copying you, Jai Lalwani, and it's

4  October 14 at 1:04 p.m.

5         Do you see that e-mail?

6  A.    Yes.

7  Q.    Would you read that, starting with who it is addressed to.

8  A.    Kenny, thanks.  I will handle.  I am copying Jai because

9  he is controlling partner and officer of MK.

10  Q.    And this is who writing this e-mail?

11  A.    Rob Koger to Kenny Desai, and copy to myself and Jai

12  Lalwani.

13  Q.    Okay.  Now let's turn the page, or actually the bottom of

14  page 2 of 4, going on to page 3 of 4.

15         Do you see an e-mail from Mr. Lalwani coming right

16  after that e-mail.

17  A.    Yes, I see that.

18  Q.    Would you read his response.

19  A.    Nice.  Kenny almost in office.

20  Q.    Okay.  Now, if we go down further on that page, there is

21  an e-mail to Jai from Rob.  Do you see that?

22  A.    Yes.

23  Q.    Okay.  Would you read that to Court, please.

24  A.    Jai, please provide Ken with transfer info.  I did my part

25  on Friday.  Please send this to Ken ASAP as he is not happy

R. Mehta - Direct

33

1    that he did not receive this confirmation yet.

2    Q.   Okay, thank you.  We talked earlier about you discovering

3    that or understanding that Mr. Lalwani had a business interest

4    in Molinaro Koger, correct?

5    A.   Yes.

6    Q.   And you were given some documents that show that?

7    A.   That's correct.

8    Q.   Okay.  I want you to very quickly just--  Well, you have

9    looked at this book before, and I am going to ask you just one

10   question.  Do the exhibits numbered 28 through 36 constitute

11   the documents that you were given?

12   A.   That is correct.

13   Q.   Okay.

14   A.   Yes, it does.

15        MR. MOTTLEY:  Your Honor, I have no further questions

16   at this point in time.  I tried to speed it up.  I apologize

17   for taking as long as I did, but I wanted to make sure that

18   some of the important things were illustrated.

19        But I would reserve the right to ask questions if

20   necessary.

21        THE COURT:  All right, I will certainly allow you to

22   redirect if necessary.

23        Any cross-examination at this time, Mr. Ward?

24        MR. WARD:  Just a little bit, Your Honor.

25        THE COURT:  Yes, sir.

1          CROSS-EXAMINATION

2     BY MR. WARD:

3     Q.   Mr. Mehta, I am going to direct you back to the beginning

4     just briefly, Exhibit 1.  Do you have that in front of you?

5     A.   Yes, I do.

6     Q.   And that e-mail was from--  I'm sorry, I'm sorry, the

7     wrong one.  Exhibit 3.

8              That e-mail, Exhibit 3, do you have that in front of

9     you?

10    A.   Yes, I do.

11    Q.   And that was from Jai Lalwani to Kenny Desai, is that

12    correct?

13    A.   Well, it was originally from Rob Koger to Jai Lalwani, Jai

14    Lalwani to Kenny Desai, and then Kenny Desai to myself.

15    Q.   So, are you suing Kenny Desai as well?

16    A.   I am sorry?

17    Q.   Do you have a lawsuit against Kenny Desai for this action?

18    A.   No, I don't.

19    Q.   And did you get involved in this transaction because of

20    Kenny Desai's involvement?

21    A.   Not necessarily, no.  I mean, I was introduced to this

22    deal through Mr. Kenny Desai, yes.

23    Q.   And other than the one phone call you said occurred prior

24    to your engaging in the transaction, what interaction did you

25    have with Mr. Lalwani?

R. Mehta - Cross

35

1   A.   Before the deposit was placed?  I had at least two

2   communication.  One was from Mr. Kenny Desai's office where we

3   were, all three on a speaker phone.

4          And the second communication was a conference call

5   between myself, Kenny Desai and Jai Lalwani.

6   Q.   Before you said there was just one before the transaction.

7   Now there are two?

8   A.   No, that communication was done from Mr. Kenny Desai's

9   office.

10  Q.   I understand.  I am trying to get the timeline correct.

11  Mr. Mottley has been very thorough with the documentation, but

12  now we are introducing phone calls.

13  A.   Right.

14  Q.   And you are saying that prior to the transaction--  You

15  earlier testified that on direct there was one communication,

16  there was a conference call in Kenny Desai's office with you,

17  Mr. Lalwani and Mr. Desai.  Now you are saying you think there

18  were two communications prior to the transaction occurring?

19         THE COURT:  Prior to the transfer?

20  Q.   Yes, sir.

21  A.   I think that was two communication.  One I may have

22  misunderstood the question the first time, but one was from Mr.

23  Kenny Desai's office.  Another one was, I believe was a

24  conference call between myself, Kenny Desai and Jai Lalwani.

25  Q.   And in those conversations, was Mr. Lalwani inducing you

1    to become involved in this transaction?

2    A.   The first communication, yes.  Second time around I think

3    it was, there was a question of escrow placement, third party.

4    My attorney was insisting to me to have a third party escrow

5    agent.  And I think that was what the conversation was about.

6    I mean, it was awhile back and I think that's what we--

7    Q.   And your own people--  So, let's go over that second

8    communication.  It was you, Mr. Desai and Jai Lalwani.  Was

9    anyone else on that call?

10   A.   No, just three of us.

11   Q.   So, your attorney wasn't?

12   A.   No, was not.

13   Q.   Mr. Koger wasn't?

14   A.   Not that I am aware of.

15   Q.   Do you know who Vani Lalwani is?

16   A.   No, I never spoke to her, I never met her, no.

17   Q.   So, you never had any contact with Vani Lalwani?

18   A.   That is correct.

19   Q.   And prior to the filing of the lawsuit, had you ever seen

20   her name?

21   A.   Only on those documents.

22   Q.   Okay.  And she, to your understanding--  Well, it's not

23   your understanding, it's what you did.  Your desire to engage

24   in this transaction that we're all discussing here, Vani

25   Lalwani had no influence on you or discussions with you prior

1 to engaging in that transaction, is that correct?

2 A. That is correct.

3 Q. And subsequent to you putting the money in, the $300,000

4 at issue, did you have any conversations with Vani Lalwani

5 afterwards?

6 A. No, I never did.

7 Q. Okay.  Do you have any intention to sue Kenny Desai for

8 this transaction?

9 A. Not at this time, no.

10 Q. I am going to direct you to Exhibit 8.  Just let me know

11 when it is in front of you.  I don't want to rush you.

12 A. This is e-mail that I sent out to Mr. Koger on August 26.

13 Q. Well, this is what I am trying to understand.  You also

14 sent it to Kenny Desai, correct?

15 A. That is correct.

16 Q. And those are the only two people you sent it to, is that

17 correct?

18 A. That's correct.

19 Q. Can you tell me why you didn't send it to Mr. Lalwani if

20 he was directly involved?

21 A. Well, I don't know, but at that time I was actually, since

22 Koger is a broker in this case, and I was under the impression

23 I would be getting information from Mr. Koger rather than

24 Lalwani.

25 Q. Okay.  But then what about Mr. Desai, why did you send it

1   to him?

2   A.   I sent a copy to him.  I am not that computer literate,

3   but my intention was to keep Mr. Desai informed.

4   Q.   Maybe I will cut through a little bit of this.  Prior to

5   wiring the $300,000, did you have any e-mail correspondence

6   with Jai Lalwani?

7   A.   Not that I recall.

8   Q.   And you had two phone conversations that you say he was

9   involved in a telephone conference?

10  A.   Yes, sir.

11  Q.   And how many conversations did you have with Kenny Desai

12  during that same period?

13         The period, just so we are clear, from the initial,

14  hey, this is a neat thing we might to get involved together, to

15  I just wired the funds.

16  A.   I have communication with Mr. Desai every day for

17  different purposes because we were involved in other

18  businesses.

19  Q.   That's fair.

20  A.   But for this particular purpose, several times.  I can't

21  say exactly.

22  Q.   More than ten?

23  A.   Not really.  It could be, could be.  I can't say one or

24  other way.

25  Q.   How about with Mr. Koger in that same time period?

1    Initial, this is an opportunity for you that Kenny brought you,

2    to I've wired the funds.  Just so we are clear on the time

3    period I am discussing.  I don't want to try to confuse you

4    here.

5    A.    About five or six different telephone calls and some

6    e-mail communications.

7    Q.    Okay.  And the same time period, just to be clear, Vani

8    Lalwani, zero?

9    A.    That is correct.

10   Q.    Okay.  I am going to direct you to Exhibit 10.  Let me

11   know when you have got it in front of you.

12   A.    Yes, I have.

13   Q.    Okay.  This is a September 1 e-mail from you to Rob Koger,

14   and you have copied Kenny Desai again, and you have copied your

15   partner James, who is in the courtroom today.

16          The same question, you don't send this to Mr.

17   Lalwani.  And my question is, why?

18   A.    Because again, Mr. Koger, as far as I considered at the

19   time, was a broker and facilitated this, what you call,

20   information.  So, I was asking him for due diligence package.

21   Q.    No, I understand that, but was your understanding when you

22   sent this that Mr. Lalwani was involved in this transaction?

23   A.    Well, I may, I may not know enough, but I thought he was

24   owner of the company.  And not all owners involved in every

25   single aspect of their business such as sending a simple

1    document as due diligence for any hotels.

2    Q.   Okay.  So, your testimony today is that when you sent

3    this, it was your understanding that Jai Lalwani was the owner

4    of the company?  You knew that at the time?

5         THE COURT:  His understanding or he knew at the time?

6    Q.   His understanding.  Thank you, Your Honor.  I apologize.

7         Your understanding on September 1 when you sent this,

8    not your understanding now as you sit here today after you have

9    hired Mr. Mottley, who has done a very good job researching

10   things, but your understanding on September 1 when you sent

11   this e-mail was that Jai Lalwani owned Molinaro Koger?

12        I know it is a little hard, I am trying to get you to

13   go back and say what did you know then, but it's important, at

14   least I think it is.

15   A.   I mean--

16        THE COURT:  If you can't answer the question, don't

17   answer it.

18   A.   I don't know.  I can't say.

19   Q.   That's fine, that's fine.  I am not playing gotcha.  If

20   you don't know, you don't know.

21        Let's just run to 11 real quick.

22   A.   I'm sorry?

23   Q.   Exhibit 11.

24   A.   Okay, I am on it.

25   Q.   Do you have it in front of you?

1   A.   Yes, I have.

2   Q.   Thank you, Mr. Mehta.  Just to let you know, I don't want

3   to rush you, so just tell me when you have it.

4         This document was, you previously testified was the

5   diligence package that you couldn't open, is that correct?

6   A.   That is correct.

7   Q.   Okay.  And this is sent from Rob Koger to Kenny Desai?

8   A.   That's correct.

9   Q.   It's not sent to you?

10  A.   That is correct.

11  Q.   And then Kenny Desai sent it to you?

12  A.   That is correct.

13  Q.   Okay.  Do you have any understanding as to why it wasn't

14  sent directly to you?

15  A.   Only thing I can remember is that at some point in time I

16  told Mr. Kenny Desai that the information is not being given to

17  me.  And I asked him to see if he can, you know, ask these

18  people to expedite this, sending the information out.

19        And again, I'm sure--  I don't know whether Mr. Kenny

20  Desai talk to Mr. Rob Koger, that is why this happened.  I do

21  not know, I cannot say.

22  Q.   Okay.  And you never got due diligence to today?

23  A.   That is correct, no.

24  Q.   Okay.  I am going to direct you to Exhibit 13.  Let me

25  know when it is in front of you.

1    A.   Yes, I have it in front of me.

2    Q.   And I see here that this is now a formal notification of a

3    decision to terminate?

4    A.   That is correct.

5    Q.   Which Mr. Mottley spent a good amount of time on this.

6    And I see that it is addressed to Molinaro Koger, attention Rob

7    Koger.

8            The same question, and I am sounding like a little

9    bit of a broken record, but why is Mr. Lalwani here?

10           This isn't an administrative thing, correct?  You are

11   not just asking for information?

12   A.   No, this is something that was done from my lawyer, yes.

13   Q.   And so, do you have any understanding, without going into

14   any privileged communications, and I know that Mr. Mottley will

15   do his job if you start to say something, do you have any

16   understanding why this was sent attention Rob Koger and not Jai

17   Lalwani?

18   A.   I do not know why my attorney done that way.

19   Q.   Okay.  Exhibit 17, it's the same question, just for the

20   record.

21   A.   Again, I don't know.  This is sent out by my attorney.  I

22   do not know.

23   Q.   Okay.  Exhibit 20, the same question, just for the record.

24   I know it is pedantic.

25   A.   Yes, sir.  Again, I do not know my attorney sent out that

1  way.

2  Q.   Okay.  Now, you said that you then had a conversation with

3  Mr. Koger to extend the due diligence discussion for 30 days, I

4  am recalling from the direct?

5  A.   Yes.

6  Q.   Okay.  And when did that occur, do you particularly

7  recall?

8  A.   I think the same day or the day after the first

9  termination, the initial notice went out, September 8 or 9th.

10  Q.   Okay.  So, right around September 8 or 9th?

11  A.   Yes, sir.

12  Q.   And who was on that call?

13  A.   Just Mr. Koger and myself.

14  Q.   Mr. Lalwani was not?

15  A.   No, sir.

16  Q.   Mr. Desai was not?

17  A.   No.

18  Q.   And Vani Lalwani wasn't anywhere near it?

19  A.   That is correct.

20  Q.   Okay.  And was there any reference to, I have got to talk

21  to Mr. Lalwani about this?  Or was Mr. Lalwani mentioned at any

22  time?

23  A.   I don't recall.

24  Q.   Okay.  I am just going to jump ahead to Exhibit No. 21.

25       Now, there are some things here that say:  Quoted

R. Mehta - Cross

44

1   text hidden.  Do you have any idea what that is?

2   A.   I am sorry, I didn't get the question.

3   Q.   I will direct to you the second page of the exhibit.  Are

4   you at Exhibit 21?

5   A.   Yes, I am on the second page.

6   Q.   There are sections that say:  Quoted text hidden.  I see

7   it at the top, I see it in the middle, and I see it twice at

8   the bottom.

9        Do you have any idea what is going on there?

10  A.   No, I don't know.

11  Q.   Okay.  The same question as to page 3:  Quoted next

12  hidden.

13       No idea what's going on?

14  A.   No, I don't.

15  Q.   And did this document come from your files?

16  A.   Yes, it does.

17  Q.   Okay.  I am going to go back to Exhibit 3, and then I

18  think I am going to be done.

19  A.   I am on it.

20  Q.   Okay.  Exhibit 3, I am looking at the body of the e-mail,

21  which is indeed an e-mail between Jai Lalwani and Kenny Desai.

22  It says:  Kenny, please advise your guys.

23       Now, Mr. Mottley, I don't want to say, testified

24  earlier, but I guess I do, said that your guys means you?

25  A.   That is correct.

R. Mehta - Cross

45

1    Q.   How is that correct?  How do you know?

2    A.   Because that is why Mr. Kenny Desai sent me this thing.

3    And I was in negotiation for this property.  So, I guess I have

4    to assume that it is--  It was sent to me from Mr. Desai for a

5    reason.

6    Q.   So, you know that Mr. Desai wanted to send it to you so

7    you could be one of his guys?

8    A.   I was one of his guys.

9    Q.   But you don't know who Mr. Lalwani meant when he said your

10   guys?

11          You can't sit here today under oath and say I know

12   who Mr. Lalwani was talking about, can you?

13   A.   I mean, yeah, I guess you can say that.  But I know it was

14   meant for me because I was the only one that was negotiating

15   through Mr. Kenny Desai, and I spoke to Mr. Lalwani beforehand

16   on this thing.

17   Q.   If it was meant for you, why wasn't it sent to you?

18   A.   Well, because I guess Mr. Lalwani at that point did not

19   have my e-mail address.

20   Q.   If it was meant for you, why didn't it mention you by

21   name?

22   A.   I do not know.

23   Q.   And lastly, if it was meant for you, why did it pluralize

24   guys when you said you were the only guy?

25   A.   Because when I say, me and my partner that was aware of

K. Mehta - Recross

46

1    that.

2          MR. WARD:  Okay.  That's all I have.  Thank you.  I

3    am handing the witness over.

4          THE COURT:  All right, thank you.

5          Any redirect?

6          MR. MOTTLEY:  Just a little bit, Your Honor.

7        REDIRECT EXAMINATION

8    BY MR. MOTTLEY:

9    Q.   Mr. Mehta, just to clarify some things about Mr. Desai.

10   There is no contract, is there, where Mr. Desai or any company

11   he owns or is involved in promised to pay your escrow deposit

12   back to you, is that correct?

13   A.   That is correct.

14   Q.   Okay.  And no deposit was given by NJ Hotel to either Mr.

15   Desai or any company that to your knowledge he owns or has an

16   interest in?

17   A.   That is correct.

18         MR. MOTTLEY:  Okay.  I have no further questions,

19   Your Honor.

20         THE COURT:  All right.

21         MR. WARD:  Can I get one more question after that,

22   Your Honor, just to clean that up?

23         THE COURT:  Yes, go ahead.

24       RECROSS-EXAMINATION

25   BY MR. WARD:

K. Mehta - Recross

47

1   Q.   Along this same vein.

2   A.   Okay.

3   Q.   There was never any contract between you and Vani Lalwani,

4   correct?

5   A.   That is correct.

6   Q.   And there was never any contract between you or any entity

7   you owned or controlled and Black Diamond Hospitality, correct?

8   A.   That is correct.

9   Q.   And there was never any contract between you and any

10  entity you owned or was involved in this $300,000 transaction

11  on your behalf and Black Indictment Brokerage Services,

12  correct?

13  A.   That is correct.

14         MR. WARD:  Okay.  Thank you very much.

15         THE COURT:  All right.  You may resume your seat.

16  Thank you, sir.

17         NOTE:  The witness stood down.

18         THE COURT:  Do you have any other witnesses you want

19  to call?

20         MR. MOTTLEY:  No, sir.

21         THE COURT:  Mr. Ward, any witnesses that you want to

22  call at this time?

23         MR. WARD:  I don't have any witnesses, Your Honor.  I

24  am fighting with one arm tied behind my back.

25         THE COURT:  Well, do you have-- Let me have any

1   argument you have against the request for the preliminary

2   injunction at this time.  Mr. Mottley has stated he was not

3   asking for a receivership.

4          Tell me why I shouldn't continue the TRO order and

5   turn it into a preliminary injunction?

6          MR. WARD:  Molinaro Koger, that's one story.  Robert

7   Koger, that's another story.  I represent Molinaro Koger, but I

8   don't think, I don't think I can fight too hard there, Your

9   Honor, because they are all over this stuff.

10         Black Diamond Brokerage Services, there are no

11  contracts involved here between them and plaintiffs.

12         Black Diamond Hospitality MK, LLC, the same story, we

13  just heard it seconds ago.

14         Vani Lalwani, not within literally 1,200 miles of

15  this because she is in Florida.

16         I don't know why they are here.  Actually, Your

17  Honor, that's not true, I do know why they are here.  Because

18  they have got money.  And that is not a reason to get

19  injunctive relief.

20         The other issue we have got here, Your Honor, is this

21  is about money.  This isn't about me wanting to build some

22  condos on your golf course.  This isn't about me wanting to

23  drive my trucks through your yard.  This is not something that

24  really merits injunctive relief in my opinion.

25         I understand the case law.  I understand that there

1    is this escrow language, but the fact of the matter is this is

2    money.  This can be solved with money damages.

3           My clients have money.  My clients are trying to

4    resolve things.  But to have injunctive relief against my

5    clients will only paralyze things.

6           The other issue is we have heard a lot about, what I

7    call the footnote 1 cases.  Do you know what I am talking about

8    when I say the footnote 1 cases?

9           THE COURT:  No.

10          MR. WARD:  Okay.  Footnote 1 to his motion, footnote

11   1 to his complaint.  I would do the same thing if I was in Mr.

12   Mottley's case, every opportunity he gets he says, look at all

13   these other cases, Your Honor.  In fact, some of them were

14   before you.

15          THE COURT:  Well, I take judicial notice that Mr.

16   Koger is in financial distress, and that he has managed to pay

17   some of the persons back, and those cases have been resolved.

18   I can look at that and see exactly what is going on.  Why can't

19   I?

20          MR. WARD:  Your Honor, Mr. Koger is not paying them

21   back.  My guys are paying them back.

22          THE COURT:  Your clients have taken the chance that

23   he has got something that is of value to them.

24          MR. WARD:  Exactly.  And, Your Honor, I have handed

25   up to you before what we are trying to do.  We are trying to

50

1    take everything of his that is illiquid, and all these

2    different things, including putting a deed of foreclosure on

3    his house.

4           THE COURT:  The issue and the relevance to the

5    injunctive relief is that there is only so much money available

6    to the people who placed it in Mr. Koger's hands for purposes

7    of being held in escrow with an agreement that it could be

8    returned at any time on the investor's request.  And that when

9    there is a limited pool of money, it's first in, first out.

10   That's the urgency.

11          And I think that the case law fully supports that for

12   purposes of returning money as well as goods and services.

13          Go ahead.

14          MR. WARD:  For purposes of Mr. Koger, I couldn't

15   disagree, I couldn't agree with you more.

16          For the purposes of even Molinaro Koger, I can

17   understand where you are coming from.  My clients have bought

18   Molinaro Koger.  They have bought what is a distressed asset.

19   It has got issues that it has to deal with.

20          I don't hear anything from plaintiff as far as

21   testimony, and I don't see anything from plaintiff as far as

22   documentary evidence, that says that Black Diamond Brokerage

23   Services was involved in this.  That says that Black Diamond

24   Hospitality MK was involved in this.  That says that Vani

25   Lalwani was involved in this.  Or that Jai Lalwani was involved

1    in this.

2                    If you need injunctive relief--

3                    THE COURT:  There is an acquisition agreement between

4    Koger, Robert T. Koger, not Molinaro Koger, and as sole owner

5    of Molinaro Koger, pulling them both in, by Black Diamond

6    Brokerage Services and Black Diamond Hospitality, collectively

7    referred to as BD, that's Exhibit 28.  And Vani Lalwani signed

8    that as the managing partner of the holding company.

9                    MR. WARD:  And we were buying a distressed asset.  We

10   had no knowledge of this.  There has been no evidence put forth

11   that there was any knowledge of that.  We have provided--

12                   THE COURT:  Well--

13                   MR. WARD:  Your Honor, if I may.

14                   THE COURT:  Mr. Lalwani was involved in two of the

15   conversations with Mr. Mehta before the money was transferred.

16                   MR. WARD:  So we get testimony today, but I have no

17   documentary evidence of that.

18                   THE COURT:  I have got uncontradicted evidence that

19   it took place.  And I have got e-mails--

20                   MR. WARD:  And, Your Honor, there is nothing, and we

21   have discovery responses that we provided too, that says that

22   our guys don't know where the money is, we never knew where it

23   was.  We had no control over Molinaro Koger at the time, Rob

24   Koger did.

25                   THE COURT:  But if they can prove that you knew of

1    the problems and that the money was transferred, then they can

2    get substitute assets.

3            MR. WARD:  Your Honor, it's frustrating, it's not

4    your fault, I have got one armed tied behind my back here

5    because of things.  And so, I can't say anything else and I

6    have got to let you do what you do.  I hate losing, but I

7    understand what I have got to do here, which is sit down.  And

8    it is frustrating when I have got what I have got.

9            I would ask, this is all I would ask, is that you

10   withhold--  First, on Vani Lalwani, I just disagree with you.

11   But, hey, that's what we do this for.

12           Second off, I would ask that you let me come back

13   tomorrow morning if you are going to rule against me and let me

14   bring evidence.

15           THE COURT:  No.  This was your opportunity to bring

16   evidence.  I am going to, 10 o'clock tomorrow morning I am

17   going to put in place a, or replace the temporary restraining

18   order with the preliminary injunction.  And it's going to be of

19   the same breadth as the TRO.

20           I find that at this stage plaintiff, New Jersey Hotel

21   Management, has demonstrated that each of these parties was

22   arguably, certainly there is evidence to support that they were

23   aware of the negotiations between Koger, were involved in those

24   negotiations, that they acquired the company, or had acquired

25   the company back in June of 2011, that they were in partnership

1   with Mr. Koger as early as June of 2011.  That, of course, the

2   money was not returned at the request of New Jersey, the

3   plaintiff in the action.

4           And that there is a clear necessity for an injunction

5   against the assets being dissipated at this time.  And that New

6   Jersey Hotel Management has every right to seek to enjoin the

7   defendants collectively from dissipating assets.

8           And the way for the defendants to move forward and

9   get out of the bindings that tie their financial world at this

10  stage is to pay the money that they owe.  And I am sure you

11  have already told them --

12          MR. WARD:  I have.

13          THE COURT:  -- that ignoring a court order will get

14  them in a whole lot worse trouble than they probably imagine.

15          MR. WARD:  Your Honor, I have asked Mr. Mottley even

16  if I could be paid.  And Mr. Mottley did agree to those things.

17  So, we are above board on that.

18          I would ask one thing because I can't help myself.

19  Can you wait until noon?

20          THE COURT:  I will wait until noon.

21          MR. WARD:  Thank you, Your Honor.

22          THE COURT:  All right.  Mr. Mottley, if there is

23  anything for the record that you want to say beyond what I have

24  said, please feel free.

25          MR. MOTTLEY:  May I ask my client something?

1          THE COURT:  Yes, sir.

2          MR. MOTTLEY:  Your Honor, we have nothing further at

3     this time.

4          THE COURT:  All right.  Then thank you.  We will

5     enter the order at noon tomorrow granting the preliminary

6     injunction request as to each of the defendants.

7          And, Mr. Ward, I hope that the work that you did over

8     the holidays comes to fruition and the parties can amicably

9     resolve their differences.

10          MR. WARD:  I hope so too, Your Honor.  Thank you, by

11     the way, for being patient with our scheduling request today.

12     I appreciate it.

13          THE COURT:  When parties are working in earnest to

14     resolve things, I hope that every court understands that that

15     is a good thing, and I appreciate it.

16          All right, we are in recess.

17          MR. WARD:  Thank you, Your Honor.

18     ------------------------------------------------
                        HEARING CONCLUDED

19

20

21          I certify that the foregoing is a true and

22     accurate transcription of my stenographic notes.

23

24
                    /s/  Norman B. Linnell
25                  Norman B. Linnell, RPR, CM, VCE, FCRR